# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| **STANFORD FASSETT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 16-01221-CV-W-ODS** |
| | ) | |
| **VENDTECH-SGI, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF STANFORD FASSETT'S SUGGESTIONS
## IN OPPOSITION OF MOTION FOR SUMMARY JUDGMENT

Respectfully Submitted,

BROWN & CURRY, LLC

*/s/ Sarah A. Brown*
Sarah A. Brown, MO #37513
Dan Curry, MO #58264
406 West 34th Street, Suite 810
Kansas City, MO 64111
(816) 756-5458
(816) 666-9596 (FAX)
sarah@brownandcurry.com
dan@brownandcurry.com

# TABLE OF CONTENTS

I.     INTRODUCTION AND FACTUAL BACKGROUND…………………………….. 1

II.    PLAINTIFF'S RESPONSE TO VT-SGI'S STATEMENT OF FACTS…………..… 3

III.   PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS………... 15

IV.    SUMMARY JUDGMENT STANDARD………………………………………….. 35

V.     ARGUMENTS AND AUTHORITIES…………………………………………... 37

       A.  SUMMARY JUDGMENT SHOULD BE DENIED ON PLAINTIFF'S
           CLAIMS OF RACE AND AGE DISCRIMINATION UNDER THE MHRA… 37

           1.    Burden of Proof under the MHRA …………………………………37

           2.    Plaintiff's Prima Facie Case of Race or Age Discrimination……………37

                 a.    Plaintiff was qualified …………………………………………...37

                 b.    Plaintiff was treated differently supporting an inference of
                       race or age discrimination ………………………………………38

                 c.    VT-SGI is responsible for the government's directive ………….43

                 d.    Justification is not relevant in a MHRA case ……………………44

                 e.    Pretext is not relevant under the MHRA ………………………...45

       B.  SUMMARY JUDGMENT SHOULD BE DENIED ON PLAINTIFF'S
           CLAIM OF RETALIATION UNDER THE MHRA …………………………  46

           1.    Burden of Proof under the MHRA …………………………………… 46

           2.    Plaintiff's Prima Facie Case of Retaliation …………………………… 46

                 a.    Justification and Pretext are irrelevant under the MHRA ………47

           3.    Plaintiff's Retaliation Claim related to his vacation is within the
                 scope of his Charge and thus is fully exhausted ………………………47

VI.    CONCLUSION ………………………………………………………………49

i

## TABLE OF AUTHORITIES

**Cases**

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)……………………………………………35

*Alhalabi v. Missouri Dept. of Natural Resources*, 300 S.W.3d 518 (Mo. App. 2009)…. …..47, 48

*Bowolak v. Communities,* 452 S.W.3d 688 (Mo. App. E.D. 2015)………………...…………36

*Brady v. Univ. of Mo.,* 213 S.W.3d 101 (Mo. App. 2006)………………………………………39

*Chaney v. Plainfield Healthcare Ctr.,* 612 F.3d 908 (7th Cir. 2010)……………………………41

*Coleman v. Donahoe,* 667 F.3d 835 (7th Cir. 2012)……………………………………………..41

*Cox v. Kansas City Chiefs Football Club, Inc.*, 473 S.W.3d 107 (Mo. banc 2015)…...…40, 41, 49

*Daugherty v. City of Maryland Heights*, 231 S.W.3d 814 (Mo.banc 2007)……...…...…36, 45, 48

*Doe v. Phillips*, 194 S.W.3d 833 (Mo. banc 2006)……………………………………………...…..3

*E.E.O.C. v. Liberal R-II School Dist.*, 314 F.3d 920 (8th Cir. 2002)……………………………35

*E.E.O.C. v. Trans States Airlines, Inc.*, 462 F.3d 987 (8th Cir. 2006)…………………………..46

*Erickson v. Farmland Indus., Inc.,* 271 F.3d 718 (8th Cir.2001)…………………………………..45

*Fleshner v. Pepose Vision Ins.*, 304 S.W.3d 81 (Mo. banc 2010)………………………………45

*Gilliland v. Missouri Athletic Club*, 272 S.W.3d 516 (Mo. banc 2009)…………………………48

*Graham v. Long Island R.R.*, 230 F.3d 34 (2d Cir. 2000)………………………………………39

*Harvey v. Anheuser-Busch, Inc.,* 38 F.3d 968 (8th Cir.1994)….…………………………………..45

*Hesse v. Chase Manhattan Bank*, 220 S.W.3d 758 (Mo. 2007)……………………………………3

*Hill v. Ford Motor Co.*, 277 S.W.3d 659 (Mo. banc 2009)..…………………………….45, 48, 49

*Holmes v. Kansas City Mo. Bd. of Police Comm'rs ex rel. Its Members*, 364 S.W.3d 615

    (Mo.App.W.D.2012)……………………………………………………………………38, 39

*Humphries v. CDOCS West, Inc.,* 474 F.3d 387 (7th Cir. 2007)…………………………………40

*Keeney v. Hereford Concrete Products, Inc.*, 911 S.W.2d 622 (Mo. banc 1995)………………48

ii

*Korando v. Mallinckrodt,* 239 S.W.3d 647 (Mo. App. 2007)……...…………………………………39

*Lawson v. Ford Motor Co.,* 217 S.W.3d 345 (Mo. App. E.D. 2007)……………………………………3

*Lewis v. Heartland Inns of America, LLC*, 591 F.3d 1033 (8th Cir. 2010)…………..………40

*Marez v. Saint-Gobain Containers, Inc.*, 688 F.3d 958 (8th Cir. 2012)………………..…..43, 45

*McCrainey v. Kansas City Sch. Dist.*, 337 S.W.3d 746 (Mo. App. E.D. 2011)……………….46

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)………………………………………...45

*Montoya v. City of Flandreau,* 669 F.3d 867 (8th Cir. 2012)…………………………………35

*Qamhiyah v. Iowa State Univ. of Sci. & Tech.,* 566 F.3d 733 (8th Cir.2009)…………………...43

*Quick v. Donaldson Co.*, 90 F.3d 1372 (8th Cir. 1996)……………………….……………35

*Ruppel v. City of Valley Park*, 318 S.W.3d 179 (Mo. App. E.D. 2010)……………………39

*State ex rel. St. Louis-San Francisco Ry. Co. v. Buder,* 515 S.W.2d 409 (Mo. banc 1974)…………..…..3

*Staub v. Proctor Hosp.,* 562 U.S. 411 (2011)………………………………………………..………44

*Templemire v. W & M Welding, Inc.*, 433 S.W.3d 371 (Mo. banc 2014)………………………46

*Tolan v. Cotton*, 134 S. Ct. 1861 (U.S. 2014)……………………………..…………35, 38

*Torgerson v City of Rochester,* 643 F.3d 1031 (8th Cir. 2011)……………..…….....…….35, 43

*United States Postal Bd. Governor v. Aikens*, 460 U.S. 711 (1986)……………………………39

*Wierman v. Casey's General Stores,* 638 F. 3d 984 (8th Cir. 2011)……………………………45

*Williams v. Trans States Airlines, Inc.*, 281 S.W.3d 854 (E.D. 2009)…………………………...39

*Young v. American Airlines, Inc.*, 182 S.W.3d 647 (Mo. App. E.D. 2005)…….....……...38, 39, 40

*Young v. Warner-Jenkinson Co.,* 152 F.3d 1018 (8th Cir.1998)…………………………...40

**Statutes**

R. S. Mo. §

1.170…………………………………………………………………………….............. 2, 3

R. S. Mo. § 1.180……………………………………………………………………… 2, 3

Case 4:16-cv-01221-ODS   Document 44   Filed 12/11/17   Page 4 of 56

R.S. MO. 213.010 …………………………………………………………………………… *passim*

R. S. Mo. § 213.070.2……………………………………………………………..………………..47

**Other Authorities**

Fed.R.Civ.P. 56……………………………………………………………………………………3, 37

Mo. Const., Article I § 13………………………………………………………………………...2

W.D.Mo. Local Rule 56.1…………………………………………………………………………...3

**PLAINTIFF'S OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

COMES NOW Plaintiff, by and through his counsel of record, and for his response in opposition to Defendant's Motion for Summary Judgment, states as follows:

## I.      INTRODUCTION AND FACTUAL BACKGROUND.

This is a Missouri Human Rights Act ("MHRA") case. R.S. Mo. 213.010, et seq. Plaintiff Stanford Fassett ("Plaintiff" or "Fassett"), a former marine, is employed by Defendant VT-SGI as a protective security officer ("PSO"). Plaintiff has been working as a PSO pursuant to a contract with the Department of Homeland Security ("DHS") / Federal Protective Service ("FPS") since 2010.   Defendant VendTech-SGI, LLC ("VT-SGI") acquired the DHS/FPS contract to provide security services at federal facilities in Kansas City, Missouri, in 2012 and became Plaintiff's employer at that time.

Throughout the entirety of his employment, Plaintiff has been an exceptional employee. Fassett was stationed at different governmental buildings in the Kansas City Metropolitan area, including the Richard Bolling Federal Building at 601 East 12th Street, where he is currently located.  He had never had any issues with the federal employees at the post he was tasked to secure.

 On April 22, 2015, Fassett was working at his post when a white, female government employee abruptly entered the building. Fassett asked to see her badge.  When she kept walking, Fassett touched her on the shoulder with the back of his hand and asked to see her badge.  The woman turned and said "Don't ever touch me," showed Fassett her badge and left.  Later that same day, Fassett learned this female had accused him of sexual harassment.  A VT-SGI manager telephoned Fassett at home and immediately suspended him from work, at the direction of FPS, despite his stellar record.  Plaintiff claims Defendant discriminated against him when it

1

suspended him for eight months without pay based on an unsubstantiated claim of sexual harassment by a government employee in the facility where Fassett and his accuser both worked.

Defendant asks the Court to believe that this case is cut-and-dried – there is zero tolerance for sexual harassment and the government forced VT-SGI to suspend Fassett.  But Fassett never sexually harassed anyone.  Touching a female employee on the shoulder with the back of your hand to verify her badge for entry into the building is not sexual harassment. Plaintiff was "tried and convicted" of the accusation without any investigation or consideration. Because of his race, and perhaps his age, Fassett suffered an eight-month suspension, for simply doing his job, at the hands of FPS and VT-SGI officials without any reasonable or prompt investigation or determination as to the truth.

Defendant's argument that no comparator was treated differently misconstrues the factual record.  Critically, a similarly situated white PSO, Wesley Bohrn, who did make sexually charged statements to female government employees on more than one occasion, was permitted by both Defendant and FPS to continue to work after reports of his impropriety surfaced. Defendant argues that FPS did not demand his suspension, but VT-SGI failed to report Bohrn's conduct to FPS as required under the contract.  In addition, three other white employees accused of unprofessional conduct were not immediately removed from the contract after receiving conduct complaints from federal employees through FPS.

Plaintiff filed this action in state court pursuant to the Missouri Human Rights Act ("MHRA") after receiving his Right to Sue.[1]  Defendant removed this case to federal court on

---

[1]   Defendant's 2015 suspension in violation of the MHRA at issue in this lawsuit, as well as the commencement of Plaintiff's lawsuit, all preceded the passage and effective date of SB 43 of August 28, 2017. Plaintiff's substantive rights to pursue his claims for race and age discrimination and retaliation under the MHRA in this lawsuit cannot be retroactively altered or changed without violating the Missouri Constitution, Article I § 13 and the provisions of R.S. Mo. §§ 1.170 and 1.180.  The prohibition against

November 16, 2016. (ECF No. 1). Fassett claims his suspension was discriminatory under the MHRA based on his age and race. He also claims his lengthy suspension, VT-SGI's challenge to his unemployment benefits and its elimination of his vacation in 2016 was retaliatory. The evidence shows that FPS only directed VT-SGI to suspend black employees accused of sexual harassment. Contrary to Defendant's assertions, Fassett has shown that "similarly situated" comparators were treated more favorably. The undisputed evidence establishes an inference of unlawful discrimination and retaliation by VT-SGI.

Defendant has moved for summary judgment on each count. Because there are genuine issues of dispute regarding the material facts relevant to each of the foregoing claims, Defendant's motion for summary judgment should be denied so that this matter may proceed to trial.

## II.     PLAINTIFF'S RESPONSE TO VT-SGI'S STATEMENT OF UNCONTROVERTED FACTS.

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Plaintiff provides the following responses to VT-SGI's statement of facts ("SOFs"):

**VT-SGI and Fassett**

1.     VT-SGI provides security services at Federal facilities pursuant to a Federal government contract at various locations in Iowa, Nebraska, Kansas and Missouri, including in

---

retrospective application of statutes has been "part of Missouri law since this State adopted its first Constitution in 1820." *Doe v. Phillips*, 194 S.W.3d 833, 850 (Mo. banc 2006). In addition to the Missouri Constitution, Missouri statutes also contain prohibitions against the retroactive application of repeals of statutory provisions to civil cases that have already accrued or commenced. R.S.Mo. § 1.170 and R.S. Mo. § 1.180. The provisions of the MHRA that prohibit discrimination on the basis of race in employment are all substantive in nature, and cannot be applied retroactively. *See State ex rel. St. Louis-San Francisco Ry. Co. v. Buder,* 515 S.W.2d 409, 411 (Mo. banc 1974); *Hesse v. Chase Manhattan Bank*, 220 S.W.3d 758, 769 (Mo. 2007); *Lawson v. Ford Motor Co.,* 217 S.W.3d 345, 349 (Mo. App. E.D. 2007).

the Kansas City area.  (Ex. 1, Fassett Depo. at 11:12-25; Ex. 2, Graf Depo. at 17:18-21; Ex. 3, Howard-Watts Depo. at 35:2-5).

**Uncontroverted.**

2.      VT-SGI has no other commercial or government contracts and everyone employed by it works under its contract with the Federal government.  (Ex. 3, Howard-Watts Depo. at 48:3-9; Ex. 4, Declaration of Brent Graf ("Graf Decl.") at ¶ 3)

**Uncontroverted.**

3.      Stanford Fassett is a 51-year-old, black male who began working for VT-SGI on or about June 1, 2012.  (Ex. 5, Fassett Depo Exhibit 14, Complaint at ¶ 2; Ex. 1, Fassett Depo. at 27:2-5).

**Uncontroverted, but incomplete as Plaintiff has been working under the same contract as a PSO since 2010.  (SOF ¶38, infra).**

4.      Fassett worked as a Protective Security Officer ("PSO") for VT-SGI under its contract to provide services for the Department of Homeland Security, Federal Protective Service ("FPS"). (Ex. 1, Fassett Depo. at 9:13-24, 10:6 – 11:25; Ex. 6, Fassett Depo. Exhibit 1, Offer Letter).

**Uncontroverted, but incomplete in that Plaintiff has worked as a PSO, and performed the same job duties, pursuant to this FPS contract since 2010.  (SOF ¶¶38-39, infra).**

5.      Since approximately 2012, Fassett has worked at a government facility located at 601 East 12th Street in Kansas City, Missouri.  (Ex. 1, Fassett Depo. at 29:15 – 30:15).

**Uncontroverted, but incomplete in that Plaintiff has been working as a PSO under the same contract since 2010 and VT-SGI merely acquired the contract in 2012, and**

4

Plaintiff has worked at different governmental buildings in the Kansas City Metropolitan area. (SOF ¶¶38, 39 and 44, infra).

### PSO Job Requirements Included Compliance with FPS Policies

6.     PSOs, including Fassett, are provided with a VT-SGI employee handbook, which includes provisions prohibiting sexual harassment. (Ex. 1, Fassett Depo. at 12:20 – 14:3; Ex. 21, Fassett Depo. Exhibit 2, VT-SGI Employee Handbook Excerpt).

**Uncontroverted.**

7.     PSOs are also provided with FPS policies contained in what is referred to as a SMART Book; Fassett most recently received one in March 2015. (Ex. 1, Fassett Depo. at 15:5 – 17:6).

**Uncontroverted.**

8.     The SMART Book contains FPS's guidelines with which PSOs need to comply, including guidelines regarding work-related conduct and prohibiting sexual harassment. (Ex. 1, Fassett Depo. at 16:22 – 17:6; Ex. 2, Graf. Depo. at 20:8-12, 43:8-11; Ex. 8, Fassett Depo. Exhibit 5, Smart Book Excerpt).

**Uncontroverted.**

9.     To maintain employment with VT-SGI, PSOs, including Fassett, had to comply with both VT-SGI's job-related requirements and also the requirements imposed by FPS on VT-SGI. (Ex. 1, Fassett Depo. at 12:1-6).

**Uncontroverted as stated, but controverted to the extent that this statement suggests that Fassett was not qualified or failed to comply with VT-SGI's job-related requirements. (See SOF ¶¶ 45-47, infra).**

5

**VT-SGI's Contract with FPS**

10.     VT-SGI's contract with FPS largely consists of a Statement of Work ("SOW") which includes various requirements, rights and responsibilities of FPS and VT-SGI, including qualifications and performance standards that VT-SGI employees must meet. (Ex. 2, Graf Depo. at 11:20-23 and 12:25 – 14:3; Ex. 1, Graf Depo. Exhibit 1, Excerpt from Statement of Work Contract).

        **Uncontroverted.**

11.     The SOW allows FPS to direct the suspension of any PSO from working under the contract for a variety of reasons, including but not limited to failure to maintain satisfactory performance.  (Ex. 3, Howard-Watts Depo. at 56:15 – 57:11; Ex. 2, Graf Depo. at 76:2 – 77:25; Ex. 9, Graf Depo. Exhibit 1, SOW at sec. 10.3.1 and 10.3.2).

        **Uncontroverted, but incomplete as the SOW also requires VT-SGI to report "any adverse information coming to their attention concerning contract employees" and gives VT-SGI the right to appeal a decision by the CO who has directed the removal of a contract employee to a supervisory level above the CO.  (See SOF ¶¶94, 97 and 130, infra; Ex. 1, Graf Depo. Exhibit 1, Statement of Work at p. 51).**

12.     VT-SGI cannot employ any PSO who does not satisfy all FPS standards for employment.  (Ex. 4, Graf Decl. at ¶ 4).

        **Controverted to the extent that this statement of fact suggests that Fassett was not qualified or did not satisfy all FPS standards for employment. (See SOF ¶¶ 45-47, infra).**

13.     PSOs are made aware during training that if a government employee or visitor complains to FPS about sexual harassment by a PSO, FPS will investigate the complaint and it is

6

possible the PSO will be removed from working under the contract until the FPS investigation is complete. (Ex. 4, Graf Decl. at ¶ 5; Ex. 8, Fassett Depo. Exhibit 5, Smart Book Excerpt).

**Uncontroverted, but incomplete. The SMART book states: "If a government employee or visitor complains to the DHS or FPS about sexual harassment by a PSO, FPS will initiate an investigation, and <u>it is probable that the employer will be asked to make a determination about removing the individual</u>(s) from the contract until the investigation is completed." (SOF ¶91, infra; Ex. 2, Fassett Depo. Exhibit 5, SMART Book Excerpt, at p. 85, SWF VT 000289).**

## Fassett's Suspension

14.     On April 23, 2015, FPS directed VT-SGI to suspend Fassett from working under VT-SGI's contract with FPS, pending the outcome of an FPS investigation.  (Ex. 1, Fassett Depo. at 75:16-19; Ex. 4, Graf Decl. at ¶¶ 6-7; Ex. 10, Letter dated April 23, 2015, from the FPS to VT-SGI regarding Plaintiff's suspension).

**Uncontroverted.**

15.     Fassett was suspended from working by VT-SGI at the direction of FPS based on an allegation of sexual harassment made against Fassett by a Federal government employee. (Ex. 1, Fassett Depo. at 31:19 – 32:6; Ex. 4, Graf Decl. at ¶ 7; Ex. 10, Letter dated April 23, 2015, from the FPS to VT-SGI regarding Plaintiff's suspension).

**Uncontroverted that Fassett was suspended. Controverted that Fassett sexually harassed anyone or that the allegation made could be reasonably construed as sexual harassment. (See SOF ¶¶63 and 69, infra).**

16.     VT-SGI was not allowed to interview Fassett's accuser because she was a government employee, and VT-SGI was not allowed to interfere in any way with FPS's

investigation; VT-SGI, however, obtained a statement from Fassett that was also provided to FPS. (Ex. 1, Fassett Depo. at 48:24 – 50:2; Ex. 2, Graf Depo. at 49:3-13; Ex. 4, Graf Decl. at ¶ 8).

**Controverted. There is no policy or regulation preventing VT-SGI from conducting a prompt investigation. (SOF ¶104, infra). The email from FPS suggests it was waiting for VT-SGI to complete its investigation as it asked VT-SGI to "provide a response with what action(s) VT-SGI plans to take." (Ex. 3, Fassett Depo. Exhibit 9 – Email Exchange Re PSO Fassett; Ex. 5, Email Exchange Regarding Investigations). As of April 27, 2015, both FPS and VT-SGI had the statement from the white, female marine who accused Plaintiff of sexual harassment, a statement from PSO Beck who worked with Fassett, as well as Fassett's statement and his answers to follow-up questions. As there were no additional witnesses, both entities had all of the information they needed to complete their investigations that were mandated by their policies to be prompt. (SOF ¶¶63-65, 72-76, 104 and 106, infra.)**

17.     Fassett was advised at the time that FPS was going to investigate the matter and that he would be suspended pending the outcome of FPS's investigation. (Ex. 1, Fassett Depo. at 32:19 – 24).

**Uncontroverted.**

18.     The allegation against Fassett was that he sexually harassed a female government employee. (Ex. 1, Fassett Depo. at 31:19 – 32:6; Ex. 10, Letter dated April 23, 2015, from the FPS to VT-SGI regarding Plaintiff's suspension).

**Uncontroverted that this was the allegation. Controverted that Fassett sexually harassed anyone. (See SOF ¶¶ 63 and 69, infra).**

19.    During Fassett's suspension, VT-SGI communicated with FPS in an effort to determine the status of the investigation.  (Ex. 4, Graf Decl. at ¶ 9).

**Uncontroverted but misleading as phrased.  The only times that VT-SGI communicated with FPS was in April 2015 when they shared Fassett's statement and in October 2015 after Fassett filed his Charge of Discrimination.  (Ex. 4, Graf Depo. at 123:7-124:8, 130:7-10; Ex. 3, Fassett Depo. Exhibit 9 – Email Exchange Re PSO Fassett; Ex. 5, Email Exchange Regarding Investigations; Ex. 11 and 12, Fassett Depo. Exhibits 15 and 16 – Charges of Discrimination).**

20.    Fassett never filed a grievance with his union regarding his suspension.  (Ex. 1, Fassett Depo. at 65:23 – 66:1).

**Controverted.  See Exhibit 6, Fassett Depo. at 143:24-144:12, where he testified as follows: "Q. Did you talk to your union about what had happened to you?  A.  Yeah, I did.  I contacted the union president and he says there's nothing I can do, that's between VendTech and the FPS.  Q. Okay, So, you did talk to the union to see if there were any avenues you could pursue through the union?  A. That's correct."  See also Exhibit 7, Grievance Documents (SWF VT 000603-000607), produced after Fassett's deposition in this case, which show a grievance was filed and appealed through Step 3, with VT-SGI denying each step. (SOF ¶ 112).**

21.    At the time that Fassett was suspended, he had never made any type of complaint; it was only *after* he was suspended that he made a complaint. (Ex. 1, Fassett Depo. at 75:20 – 76:18; 97:5-15).

**Controverted as worded.  It is undisputed that *prior* to his suspension, Fassett never made any complaints of discrimination.  (Ex. 6, Fassett Depo. at 75:20-76:4).  However, at**

9

the time of his suspension and after having been suspended, he made complaints. (Ex. 6, Fassett Depo. at 66:1-3, 144:1-3). Fassett also provided a statement openly opposing the accusation as false. (Ex. 8, Fassett Depo. Exhibit 10 – Statement of Fassett).

## Fassett's Return to Work

22.     On December 8, 2015, VT-SGI received a letter from FPS stating that the government had completed its investigation into the allegation against Fassett, that the results had failed to provide sufficient evidence to support the allegation, and that Fassett's suspension was lifted. (Ex. 4, Graf Decl. at ¶ 10; Ex. 11, Letter dated December 8, 2015 from FPS to VT-SGI lifting Fassett's suspension).

**Uncontroverted.**

23.     Fassett was then put back to work by VT-SGI on December 10, 2015, and he was returned to work at the same facility where he previously worked and at the same pay rate on the same shift; and he is still employed by VT-SGI. (Ex. 1, Fassett Depo. at 64:4 – 65:5; Ex. 4, Graf Decl. at ¶ 11).

**Controverted. Fassett was not able to return to work until after he updated all of the certifications that had expired while he was on suspension. (SOF ¶88 and 164, infra). Fassett did not receive his vacation time and holiday pay he was entitled to based on his seniority after returning to work. (SOF ¶¶167 and 168, infra; Ex. 6, Fassett Depo. at 93:3-11, 94:8-13).**

## Fassett's "Evidence" of Differential Treatment

24.     Fassett claims he is aware of one PSO who was accused of sexual harassment but was not suspended like Fassett – a PSO with the last name of Bohrn. (Ex. 1, Fassett Depo. at 66:14-23; 70:24 – 71:2).

10

**Uncontroverted.**

25.    Fassett admits he has no personal knowledge about PSO Bohrn's situation and that he only knows what he heard from former assistant area manager Andre Smallwood and coworker Kaseem Hurley.  (Ex. 1, Fassett Depo. at 66:25 – 68:9).

**Uncontroverted that Fassett testified to this.  However, after his deposition, Defendant produced documentation concerning PSO Bohrn's employment and his sexual harassment issues.  (SOF ¶¶ 118-128, infra; Ex. 9, Graf Depo. Exhibit 23 – PSO Bohrn Personnel File).**

26.    Unlike Fassett, PSO Bohrn was never actually accused of sexual harassment by a Federal government employee.  (Ex. 12, Hill Depo. at 33:6 – 34:20; 35:18-24).

**Controverted.  Fassett testified that Andre Smallwood told him that PSO Bohrn was accused of sexual harassment by a federal employee.  (Ex. 6, Fassett Depo. at 66:14-19, 67:5-11, 71:3-8).  VT-SGI is playing with semantics by labeling Bohrn's inappropriate, sexual comments as "unprofessionalism."  (See SOF ¶¶121, 122 and 126-127, infra).**

27.    Unlike Fassett, FPS never directed VT-SGI to suspend PSO Bohrn from working under the contract.  (Ex. 4, Graf Decl. at ¶ 13).

**Uncontroverted but incomplete.   VT-SGI has an obligation under the SOW to report "any adverse information coming to their attention concerning contract employees," which supports Plaintiff's contention that VT-SGI treated Bohrn, a white man, more favorably than Plaintiff, and thus discriminated against him.  (See SOF ¶¶97, 120, 124 and 130-131, infra; Ex. 1, Graf Depo. Exhibit 1, Statement of Work, at p. 51).  In addition, FPS never directed VT-SGI to suspend other white PSOs accused of inappropriate conduct. (See SOF ¶¶135, 136, 143, 148 and 157, infra).**

11

28. In 2017, PSO Bohrn was terminated by VT-SGI for unprofessional behavior following a customer complaint. (Ex. 13, O'Day Depo. at 27:11 – 29:17).

**Uncontroverted but misleading. Bohrn's termination was based on his comments and actions. (See Ex. 10, Steven O'Day Depo. at 29:18–29:14). His comments and conduct included referring to himself as "Big Daddy" and making sexual remarks to a female government employee such as "I can't wait to screen you when we start up," which resulted in a complaint filed against Bohrn. (Ex. 10, O'Day Depo. at 27:19-28:15).**

29. Prior to his suspension, Fassett never had any concerns that any of his supervisors or managers discriminated or retaliated against him in any way. (Ex. 1, Fassett Depo. at 77:10-14)

**Controverted. Fassett testified that: "Being it's over, I mean—no, I won't answer that now because I could think back probably sometime maybe that I may have saw that someone got treated a tad bit different. But I can't give you a pinpoint date or anything like that, if you will." (Ex. 6, Fassett Depo. at 96:24-97:3).**

30. No one in VT-SGI management has ever made any racist or ageist comments that Fassett has heard. (Ex. 1, Fassett Depo. at 95:13-23).

**Controverted to the extent that Defendant attempts to imply that racist or ageist comments are required or necessary to show that race or age discrimination exists. Otherwise, it is uncontroverted that Fassett testified that he wasn't in the office to hear management comments. "I mean, I'm not in the office, so no." (Ex. 6, Fassett Depo. at 95:18).**

31. No one ever told Fassett that his suspension was because of his race or age. (Ex. 1, Fassett Depo. at 107:2-5).

12

Controverted to the extent that Defendant attempts to imply that racist or ageist comments are required or necessary to show that race or age discrimination exists. Plaintiff's testimony indicates that his belief that he was suspended because of his race or age. Plaintiff felt his suspension was discriminatory and assistant area manager Andre Smallwood told him about events regarding a white employee, PSO Bohrn, who was not suspended following complaints of sexual harassment, which infers that Fassett's suspension was discriminatory. (See Ex. 6, Fassett Depo. at 67:6-11, 97:20-22, 97:23-98:2, 107:17-108:2; 111:16-21; SOF ¶¶ 118-128, infra).

Fassett also filed a Charge of Discrimination claiming his suspension in 2015 was due to his race and age, along with retaliation. (Ex. 11 and 12 – Fassett's Charges of Discrimination).

**Fassett's Vacation Allotment**

32. Each PSO's vacation allotment is controlled by terms in a collective bargaining agreement between VT-SGI and the International Union, Security, Police and Fire Professionals of America (SPFPA) and its Amalgamated Local 249 (the "CBA"). (Ex. 4, Graf Decl. at ¶ 14; Ex. 4-C, Graf Depo. Ex. 4, Excerpt from the CBA).

Controverted. Plaintiff's letter confirming his offer of employment states for "Vacation" that upon completion of 1 year, 2 weeks of vacation is earned; upon completion of 8 years, three weeks is earned; and vacation is prorated for part-time (PT) employees based on hours worked. (See Ex. 13, Fassett Depo Ex. 1 – Offer Letter). This offer does not prorate vacation for fulltime employees based on hours worked the preceding year. (Ex. 14, Fassett Declaration at ¶26). Based on his seniority of 5 years, Fassett was entitled to 2 weeks (80 hours) of vacation, not 19.5 hours.

13

33.     The CBA provides that the amount of vacation pay an employee receives is determined generally by the employee's years of service; however, for employees who are absent for a period exceeding thirty (30) days, it is prorated based on the number of hours that were actually worked on contract for the year.  (Graf Decl. at ¶ 15).

**Controverted as stated.  The CBA's provisions about extended leaves of absence is intended to apply to employees who request such leave, not employees who are forced on leave.   See Ex. 15, Collective Bargaining Agreement ARTICLE 14, SWF VT 000436 ("Leave of Absence without pay may be granted by the company to an employee for reasonable cause" and "Generally, other leaves of absence will be for a period of less than thirty(30) days, but may be extended for reasonable cause.").**

34.     Based on the CBA, in 2016, after Fassett's return to work from his suspension, he was allotted 19.54 hours of vacation because of the fact that he only worked 508.25 hours under the contract in the prior year.  (Graf Decl. at ¶ 16)

**Uncontroverted that this is what Plaintiff was allotted.  Controverted that the CBA as interpreted by Defendant applied to Plaintiff's situation.   (See response to SOF ¶33, supra.)**

35.     Fassett never claimed in his underlying Charge of Discrimination that he was discriminated against and/or retaliated against with respect to the amount of vacation he received in 2016.  (Ex. 1, Fassett Depo. at 109:21 – 111:21; Ex. 14, Fassett Depo. Exhibit 16, Fassett Charge of Discrimination).

**Uncontroverted but misleading.  At the time he filed his charge, Fassett was still on suspension and had not yet lost his vacation.  Fassett had not been reinstated to work yet at the time he filed his Charge of Discrimination.  (See Ex. 11 and 12, Fassett Depo. Exhibits**

14

15 and 16 – Fassett's Charges of Discrimination dated 8.3.2015 and 10.13.15; and Ex. 16, Fassett Depo. Exhibit 13 – Letter of Reinstatement dated 12.8.15). It was not until he was reinstated and returned to work that he determined that he was not going to receive his vacation time from the time in which he was suspended. (Ex. 6, Fassett Depo. at 69:18-70:18; See SOF ¶168, infra; and Section (V) (B) (4) – Retaliation Claim and Scope of Charge, infra).

### III.    PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS.

36. Stanford Fassett is a 51-year old black man who lives with his wife of twenty-five (25) years in Lee's Summit, Missouri. (Ex. 1, Fassett Depo. at 25:4-5; 27:4, 17-24).

37. Fassett proudly served his country as a United States Marine for twenty-two (22) years and was honorably discharged in 2010. (Ex. 1, Fassett Depo. at 29:2-3; Ex. 14, Fassett Declaration at ¶1).

38. Fassett began working as a protective security officer (PSO) under a contract with the Department of Homeland Security (DHS) / Federal Protective Services (FPS) after his military discharge in 2010. (Ex. 1, Fassett Depo. at 10:19-11:2, 28:22-24; Ex. 14, Fassett Declaration at ¶1).

39. In March 2012, Fassett received an offer letter for the position of protective security officer (PSO) from VendTech-SGI (VT-SGI), the new company awarded the contract with FPS/DHS to provide security services at various government facilities in the Midwest area. (Ex. 1, Fassett Depo. at 9:14-10:9, 11:14-24; Ex. 14, Fassett Declaration at ¶2; Ex. 13, Fassett Depo. Exhibit 1 – Offer Letter).

40.     At the time of hiring by VT-SGI, Fassett was provided with VT-SGI's employee handbook for which he signed the Policy Acknowledge Form acknowledging receipt.  (Ex. 6, Fassett Depo. at 13:2-5, 14:1-3).

41.     Fassett also received a Protective Security Officer SMART Book for which he executed an acknowledgement form.  (Ex. 6, Fassett Depo. at 15:5-24).

42.     As a PSO, Fassett was required to comply with the job requirements that FPS imposed on VT-SGI employees.  (Ex. 6, Fassett Depo. at 12:1-5).

43.     When VT-SGI was awarded the DHS/FPS contract, FPS requested photos of all of the VT-SGI guards for the Director's office.  (Ex. 14, Fassett Declaration at ¶2).

44.     Throughout his employment, Fassett was stationed at different governmental buildings in the Kansas City Metropolitan area, including the Social Security Building at 6320 Euclid and the Richard Bolling Federal Building at 601 East 12th Street, where he is currently located.  (Ex. 6, Fassett Depo. at 29:20-30:1, 30:11-12).

45.     Fassett met all employment suitability requirements for FPS under the contract. (Ex. 4, Graf Depo. at 73:2-6).

46.     Brent Graf, the Contact Manager, had no concerns with Fassett's performance as an employee of VT-SGI. (Ex. 4, Graf Depo. at 7:8-12; 92:12-15).

47.     According to the area manager, Brian Hill, Fassett always performed satisfactory work.  (Ex. 17, Hill Depo. at 50:1-6).

48.     Fassett's main job responsibility was to check the identification of all people entering the building to prevent unauthorized access into government buildings.  (Ex. 6, Fassett Depo. at 140:18-20; Ex. 4, Graf Depo. at 38:3-9).

49.     Fassett's job duties required him to treat government employees and others who entered the building respectfully and to avoid any improper interactions.  (Ex. 6, Fassett Depo. at 81:13-19).

**DHS/FPS**

50.     Stanford Fassett did not work for FPS and he was not a federal employee.  (Ex. 4, Graf Depo. at 35:22-36:2, 60:1-3; Ex. 17, Hill Depo. at 66:24-67:4; Ex. 18, Howard-Watts Depo. at 100:20-22).

51.     FPS is not a joint employer with VT-SGI as it only sets the hours a particular post is open, and VT-SGI completes the schedules to fill the posts, is responsible for paychecks and benefits, provides uniforms, badges and equipment, and makes hiring and termination decisions.  (Ex. 4, Graf Depo. at 55:7-59:22).

**The allegation and suspension**

52.     On April 22, 2015, Fassett was falsely accused of sexual harassment by a white female government employee in the building where he works.  (Ex. 14, Fassett Declaration at ¶3).

53.     The woman who accused Fassett of sexual harassment was a Caucasian woman who had worked in the building.  (Ex. 6, Fassett Depo. at 42:16-17; Ex. 14, Fassett Declaration at ¶3).

54.     On the morning of April 22, 2015, a white, female government employee, now identified as Marilyn Keck, entered the building at an abrupt pace, preventing Mr. Fassett from seeing her badge as she entered.  (Ex. 6, Fassett Depo. at 40:9-11, 42:16-20).

55.     Fassett could not recall ever seeing Ms. Keck prior to that day.  (Ex. 6, Fassett Depo. at 42:12-13).

17

56.     Fassett worked in the 13th Street lobby, the door Ms. Keck entered, only one day each week, Tuesdays.  (Ex. 6, Fassett Depo. at 41:11-19, 42:1).

57.     When Ms. Keck did not respond to his request to see her badge, Fassett tapped her on the shoulder with the back of his hand and asked to see her badge.  Ms. Keck turned around and said "Don't ever touch me."  (Ex. 6, Fassett Depo. at 40:16-17, 41:6-7, 45:21-22).  Fassett repeated his request to see her badge, she showed it and walked off.  (Ex. 6, Fassett Depo. at 41:9-20).

58.     Fassett would not have fulfilled his job responsibilities if he did not tap Ms. Keck on the shoulder and stop her from entering without showing her badge; he could have been written up and possibly terminated if he had not stopped her.  (Ex. 6, Fassett Depo. at 139:23-140:11).

59.     Later that day, Ms. Keck made an allegation of harassment against Fassett.  (Ex. 6, Fassett Depo. at 32:3-9, 33:6-9, 82:22-24; Ex. 14, Fassett Declaration at ¶3).

60.     That afternoon FPS Officer Charles Schwartz told Fassett that someone said he was sexually harassing; Fassett said "get out of here" thinking Officer Schwartz was playing a game on him.  (Ex. 6, Fassett Depo. at 44:21-45:1).

61.     At approximately 1:00p.m., Officer Schwartz told Fassett that there really had been a complaint that he sexually harassed somebody.  (Ex. 6, Fassett Depo. at 45:5-7, 10-14).

62.     FPS officers Murphy and Shipman then approached Fassett and asked him what happened; after he told them, they informed Fassett that they would view the video footage of the event and Officer Murphy instructed Fassett to write a statement.  (Ex. 6, Fassett Depo. at 47:9-14, 48:11-19).

63.     Fassett's statement provided the following facts:

18

"On Wednesday, April 22, 2015 I was dealing with a employee who had a cart and advised me that she would be making multiple trips bringing in supplies and was waiting for the employee with the cart to retrieve her access badge. I noticed a older white female, with a leather jacket walking at a fast pace into the building. I couldn't get a clear visual of her badge. So to prevent a unauthorized entry into the federal building I stated ma'am I need to see your badge so to gain her attention I tapped her on her shoulder with the back of my hand she then shouted in a aggressive tone Don't Ever touch me! and walked off."

(Ex. 8, Fassett Depo. Exhibit 10 – Statement of Fassett).

64. FPS had received the woman's allegation on April 22, 2015, and later that day an email circulated from FPS Contracting Officer Representative Bryan Henderson to several other people, including Marcus Mason, regarding the complaint. (Ex. 6, Fassett Depo. at 39:3-10; Ex. 3, Fassett Depo. Exhibit 9 – Email Exchange Re PSO Fassett).

65. The woman's allegation in the FPS email stated: "This morning I arrived at work about 8:40; I came into the building on the 13th street side. Before I went through the metal detectors, I showed my badge to the guard and he smiled and touched my shoulder. I turned to him and said "don't ever touch me again" and kept on walking. This guard winked at me twice earlier in the week or late last week. I feel uncomfortable with this behavior and I do not feel it is appropriate. He is a young black man about 5'10" with a slight build and he has black hair and dark eyes. I would appreciate it if you would relay this Information to GSA." (Ex. 3, Fassett Depo. Exhibit 9 – Email Exchange Re PSO Fassett).

19

66.     Fassett's Area Manager, Brian Hill telephoned him at home to inform him that he was being suspended without pay pending an investigation.  (Ex. 6, Fassett Depo. at 32:22-24, 35:10-12, 36:3-5, 36:24-37:9, 65:6-8).

67.     The government considered the complaint against Fassett to be a discrimination complaint. (Ex. 4, Graf Depo. at 148:23-149:3).

68.     FPS played a part in directing Fassett's removal from working under VT-SGI's contract with FPS.  (Ex. 14, Fassett Declaration at ¶23, with attached Ex. J).

69.     Fassett did not make a sexual advance, any comment or gesture of a sexual nature, any request for sexual favors or other verbal or physical conduct of a sexual nature toward the white female federal employee on April 22, 2015 or at any time.  (Ex. 14, Fassett Declaration at ¶¶ 15 and 17).

### VT-SGI's "investigation"

70.     Mr. Fassett provided both VT-SGI and FPS with copies of his statement.  (Ex. 6, Fassett Depo. at 49:23-24, 84:16-20; Ex. 14, Fassett Declaration at ¶4).  Fassett's statement expressly refuted what the female federal employee stated as to what happened during their encounter.  (Ex. 6, Fassett Depo. at 38:8-10; Ex. 14, Fassett Declaration at ¶4; Ex. 8, Fassett Depo. Exhibit 10 – Statement of Fassett).

71.     Fassett maintained that the sexual harassment allegation made by the white, female federal employee was untrue.  (Ex. 6, Fassett Depo. at 38:2-4, 40:1-2; Ex. 14, Fassett Declaration at ¶4).

72.     Russell Beck was another officer working with Mr. Fassett on the day of the complaint.  (Ex. 6, Fassett Depo. at 51:21-23).

20

73.     Mr. Beck wrote a statement regarding the events in question. (Ex. 6, Fassett Depo. at 53:15-16; Ex. 19, Fassett Depo. Exhibit 12 – Statement of Russell Beck).

74.     Fassett was asked to answer follow up questions regarding the event, which he responded to on April 27, 2015.  In response to the follow up questions, Fassett denied ever winking at Ms. Keck.  (Ex. 6, Fassett Depo. at 41:8-13; Ex. 20, Fassett Depo. Exhibit 11 – Email Exchange Re Follow Up Questions).

75.     VT-SGI had the statement from Fassett's accuser as of April 22, 2015 as it was contained in the email from FPS.  (Ex. 3, Fassett Depo. Exhibit 9 – Email Exchange Re PSO Fassett).

76.     VT-SGI had nothing further to investigate as it had statements from the accuser, from Russell Beck and from Stanford Fassett.  There were no other witnesses and nothing else to investigate after these statements were obtained. (Ex. 8, Fassett Depo. Exhibit 10 – Statement of Fassett; Ex. 3, Fassett Depo. Exhibit 9 – Email Exchange Re PSO Fassett; Ex. 19, Fassett Depo. Exhibit 12 – Statement of Russell Beck).

**The FPS "investigation"**

77.     During his suspension, Fassett repeatedly tried to get answers regarding the FPS investigation. He would call into the VT-SGI office to inquire as to what FPS was doing, and all he was told was "they're investigating."  (Ex. 6, Fassett Depo. at 55:20-25).

78.     Mr. Fassett called Brian Hill, Andre Smallwood and Jeff Moreno to determine what was happening while he was on suspension, sending out phone calls to anyone that would listen.  (Ex. 6, Fassett Depo. at 56:11-15, 57:23-24).

79.     When Fassett contacted his supervisors at VT-SGI in May and June 2015, they told him there was nothing they could do. (Ex. 14, Fassett Declaration at ¶10).

21

80. VT-SGI refused to take any action with respect to the FPS investigation and to assist Fassett so that he could return to work. (Ex. 14, Fassett Declaration at ¶24).

81. Fassett also spoke to FPS Officer Wells regarding the investigation. (Ex. 6, Fassett Depo. at 63:2-4).

82. In September 2015, Plaintiff contacted his United States Congressman for assistance in determining why DHS/FPS was not investigating the allegation of sexual harassment because VT-SGI was not taking any action. (Ex. 14, Fassett Declaration at ¶9).

83. In response to Fassett's request for assistance from Congressman Cleaver's office, he got the run-around as to who was handling the investigation. (Ex. 6, Fassett Depo. at 55:20-56:3; Ex. 14, Fassett Declaration at ¶9).

84. In November, Fassett received a phone call from FPS saying that they had up to 90 days to complete the investigation. (Ex. 6, Fassett Depo. at 59:13-14).

85. Around November, Fassett followed up with Congressman Cleaver's office again and within hours, FPS called him back and said they wanted to meet with him. (Ex. 6, Fassett Depo. at 59:19-24).

86. In late November, FPS Investigators came to Fassett's home to discuss the matter; Mr. Fassett told them what happened and gave them his written statement to which they responded that it wouldn't take long at all. (Ex. 6, Fassett Depo. at 60:18-21). This was the first time Fassett spoke to any federal government investigator since the day of the incident. (Ex. 6, Fassett Depo. at 61:22-25).

87. On December 8, 2015, VT-SGI received notification that the sexual harassment allegations were unfounded. (Ex. 17, Hill Depo. at 41:10-22). Fassett learned he was reinstated

22

to work, and that was the extent of the outcome of the investigation. (Ex. 6, Fassett Depo. at 60:22-25, 63:18-19).

88. Upon his reinstatement to work, Fassett spent approximately one month updating his qualifications, including first aid certification, in order to resume working as a security guard at his post. (Ex. 6, Fassett Depo. at 61:11-14; Ex. 14, Fassett Declaration at ¶25).

89. The government recommended that VT-SGI consider relocating Fassett to a different post from the one where the allegations were made. (Ex. 6, Fassett Depo. at 64:9-12).

**Policies and Procedures**

90. The Protective Security Officer SMART Book defines sexual harassment as "Unwelcome sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual nature constitutes sexual harassment when submission to or rejection of this conduct explicitly or implicitly affects an individual's employment, unreasonably interferes with an individual's work performance or creates an intimidating, hostile, or offensive work environment." (See Ex. 2, Fassett Depo. Exhibit 5, SMART Book, at p. 84, SWF VT 000288); Ex. 4, Graf Depo. at 44:1-3).

91. The SMART Book states: "If a government employee or visitor complains to the DHS or FPS about sexual harassment by a PSO, FPS will initiate an investigation, and it is probable that the employer will be asked to make a determination about removing the individual(s) from the contract until the investigation is completed." (Ex. 2, Fassett Depo. Exhibit 5, SMART Book, at p. 85, SWF VT 000289).

92. It appears that in most cases, especially those involving white employees, the government followed the SMART Book policy and asked VT-SGI to make a determination, but

with respect to Fassett and PSO Hurley, both black employees, the government did not follow this policy.  (Ex. 14, Fassett Declaration at ¶18).

93.     The Collective Bargaining Agreement provides that the contractor (VT-SGI) may request reconsideration of the removal of an employee.  (See Ex. 15, Graf Depo. Exhibit 4, p. 18, SWF VT 000435).

94.     Under the SOW Contract, VT-SGI has the right to appeal a decision by the CO who has directed the removal a contract employee to a supervisory level above the CO.  VT-SGI never took such action on Fassett's behalf.   (Ex. 14, Fassett Declaration at ¶11; Ex. 1, Graf Depo. Exhibit 1, Statement of Work Contract, at p. 52).

95.     The SOW Contract between DHS/FPS and VT-SGI gives VT-SGI the right to request a reconsideration of a decision by the CO.  (Ex.1, Graf Depo. Exhibit 1, Statement of Work Contract, at p. 52).

96.     VT-SGI did not request any reconsideration of Fassett's suspension.  (Ex. 4, Graf Depo. at 50:25-51:3).

97.     The SOW Contract requires VT-SGI to report to the COTR "any adverse information coming to their attention concerning contract employees" (Ex. 1, Graf Depo. Exhibit 1, Statement of Work Contract, at p. 51).

98.     VT-SGI has a zero tolerance policy for discrimination and harassment.  (Ex. 18, Howard-Watts Depo. at 17:16-22).

99.     The VT-SGI Employee Handbook section on workplace harassment states that "unwelcome comments, pursuit or touching, use of profanity, obscene, rude or suggestive remarks or jokes, emails, internet pages, inappropriate posters, stickers and/or materials are examples of harassment." It also states that "All complaints of harassment will be investigated

24

promptly and in an impartial manner." (Ex. 21, VT-SGI Employee Handbook, at p. 4, SWF VT 000182).

100. According to VT-SGI's Human Resources Director, Fassett never violated VT-SGI's anti-discrimination/harassment policy. (Ex. 18, Howard-Watts Depo. at 45:16-19, 91:15-17).

101. VT-SGI's Human Resources Director testified that in a "he-said, she-said" situation, the employees should receive a letter of caution. (Ex. 18, Howard-Watts Depo. at 19:2-8).

102. According to VT-SGI's Human Resource Director, harassment based on disability would be improper under the policy. (Ex. 18, Howard-Watts Depo. at 20:6-9).

103. It is important to VT-SGI that employees feel they are being treated fairly. (Ex. 18, Howard-Watts Depo. at 20:21-24).

104. There is no regulation that says VT-SGI cannot interview a government employee. (Ex. 18, Howard-Watts Depo. at 82:13-21).

105. The workplace harassment policy requires a prompt and thorough investigation. (Ex. 18, Howard-Watts Depo. at 99:15-19).

106. According to Brent Graf, VT-SGI's contract manager, all complaints will be investigated promptly. (Ex. 4, Graf Depo. at 22:23-23:3).

**The Grievance**

107. At the time of his deposition, Fassett did not know that the union had grieved his suspension and Defendant did not produce relevant information about the grievance until well after his deposition. (Ex. 14, Fassett Declaration at ¶13, with Exhibit E, Grievance documents).

25

108.    The collective bargaining agreement states:

ARTICLE 13 DISCHARGE AND DISCIPLINE

F. Should the Government withdraw credentials, certifications or request the removal of any employee from the contract, **the Company will endeavor to investigate the facts that resulted in the Government's action.** If at their sole discretion, based on the investigation facts, the Company feels justified, they will prepare a letter requesting reconsideration of the employee's removal and a copy of the letter will be provided to the Local Union President or his/her designee.

(See Ex. 15, Graf Depo. Exhibit 4, p. 18, SWF VT 000435).

109.    The CBA also provides: Officers who are not in bid posts shall be assigned duties according to the needs of the Company, with consideration for seniority. Article 7, D.  (Ex. 15, Graf Depo. Exhibit 4, SWF VT 000426).

110.    ARTICLE 17 of the CBA addresses NON-DSISCRIMINATION:

The terms and provisions of this Agreement shall apply to all employees like, without discrimination with respect to race, color, religion, sex, national origin, age, veterans' status, disability, or other categories required by law. The Company shall initiate an investigation of all discrimination complaints within seven (7) calendar days after receipt of a complaint and shall notify the President of the Local Union, or designee, of the initiation.

(Ex. 15, Graf Depo. Exhibit 4, SWF VT 000436-437).

111.    VT-SGI was obligated to investigate the facts that resulted in Fassett's suspension and VT-SGI could have requested reconsideration of his suspension and removal from his post. (Ex. 14, Fassett Declaration at ¶12).

112.    On June 26, 2015, VT-SGI denied Fassett's grievance, stating in Step 1 that the Company is still conducting their investigation, then stating in Step 2 that "until FPS finishes their investigation into these 2 incidents VT-SGI cannot request reconsideration," and finally stating in Step 3 that VT-SGI "has not received any more information pertaining to the

26

suspensions" and "at this time, there is no evidence to support a request for reconsideration." (See Ex. 14, Fassett Declaration at ¶13, with Exhibit E, Grievance documents).

**Unemployment Claim**

113. The Missouri Division of Employment Security made a finding on June 5, 2015 that Fassett was not discharged for misconduct because he did not harass anyone, despite VT-SGI's allegation that he did harass an employee. (Ex. 13, Fassett Declaration at ¶ 6, with Exhibit B - Missouri Division of Employment Files, SWF 000469-470).

114. Fassett received unemployment for a part of the time he was on suspension. (Ex. 6, Fassett Depo. at 128:22-129:1).

**Protected Activity**

115. Fassett opposed the false accusation of sexual harassment when he gave his statement to FPS on April 22, 2015 and then provided a copy to VT-SGI. (Ex. 14, Fassett Declaration at ¶4, with attached Exhibit A).

116. Fassett continued to oppose the discriminatory treatment when he filed his claim for unemployment, which VT-SGI challenged stating he had harassed an employee. (Ex. 14, Fassett Declaration at ¶5).

117. Fassett raised his concern of discrimination and retaliation by filing a charge of discrimination with the EEOC and MCHR on August 3, 2015 after he learned that another officer had been accused of sexual harassment and discrimination and was not suspended. (Ex. 6, Fassett Depo. at 106:1-12, 106:23-107:1; Ex. 11 and 12, Fassett Depo. Exhibits 15 and 16 – Charges of Discrimination).

27

**PSO Wesley Bohrn**

118.     Sometime in June or July 2015, Fassett had a conversation with VT-SGI assistant area manager Andre Smallwood in which Smallwood told him about a white, male PSO named Wesley Bohrn who had been accused of sexual harassment by a federal government employee but had not been removed from the contract or suspended from work.  (Ex. 14, Fassett Declaration at ¶7).

119.     After Stanford Fassett and Kaseem Hurley were suspended without pay for allegations of sexual harassment in April 2015, the assistant area managers visited all of the facilities where VT-SGI had security guards stationed to discuss the directive that sexual harassment was not tolerated in the workplace.  (Ex. 22, Smallwood Declaration at ¶4).

120.     After the sexual harassment discussions at the facilities, VT-SGI managers received information about one of their security guards, Wesley Bohrn, who was a white male employee of VT-SGI.  (Ex. 22, Smallwood Declaration at ¶5).

121.     The security manager at the Federal Aviation Administration (FAA) building reported PSO Bohrn's conduct to an assistant area manager at VT-SGI, Jeff Moreno, who then informed the other assistant area managers and the area manager, Brian Hill that Bohrn was caught looking at a female entering the FAA building in an inappropriate manner.  (Ex. 22, Smallwood Declaration at ¶¶6 and 7).

122.     When they received this report about PSO Bohrn, the VT-SGI managers went to investigate and learned that he was making inappropriate remarks to female patrons, such as "Come to Big Daddy" as well as comments about a female patron's butt.  (Ex. 22, Smallwood Declaration at ¶¶8 and 9).

28

123. PSO Bohrn was not suspended or removed from the facility where he worked. (Ex. 22, Smallwood Declaration at ¶10). Bohrn received only a verbal warning about his conduct. (Ex. 17, Hill Depo. at 36:15-17; Ex. 14, Fassett Declaration at ¶19, with Exhibit H, BC000321-000322). His personnel file shows no discipline as of January 22, 2016. (Ex. 9, Graf Depo. Exhibit 23 – Personnel File PSO Bohrn).

124. Smallwood told Fassett that the complaint about Bohrn was "swept under the rug" and Bohrn was allowed to continue to work. (Ex. 6, Fassett Depo. at 66:14-19, 67:5-11, 71:3-8; Ex. 14, Fassett Declaration at ¶7; Ex. 22, Smallwood Declaration at ¶11).

125. Smallwood stated to Fassett that VT-SGI's treatment toward Fassett was unfair and discriminatory based on how they dealt with Bohrn and his allegations of sexual harassment and that Fassett should file with the EEOC. (Ex. 6, Fassett Depo. at 142:24-143:16, 147:5-9).

126. VT-SGI characterized Wesley Bohrn's comments such as "come to Big Daddy" as "professionalism" issues. (Ex. 17, Hill Depo. at 33:19-25).

127. In 2017, PSO Bohrn had multiple complaints of his continued sexual harassment, which included the following:

        a.    Making comments to a government employee such as "I can't wait to pat you down tomorrow."

        b.    Referring to himself as "Big Daddy."

        c.    Making female employees feel uncomfortable when he is conducting screening procedures in the way he looks at them and talks to them.

(See Ex. 14, Fassett Declaration at ¶20, with attached Exhibit I, SWF VT 000608-000621).

29

128. PSO Bohrn was later terminated after a series of incidents of sexual harassment in which he stated how he was going to screen a female employee. (Ex. 6, Fassett Depo. at 68:22-69:14; Ex. 14, Fassett Declaration at ¶20, with attached Exhibit I, SWF VT 000608-000621).

129. Other than PSO Bohrn, Fassett is not aware of any other PSO who has been accused of sexual harassment and who was not suspended for it. (Ex. 6, Fassett Depo. at 70:24-71:2).

130. The VT-SGI SOW Contract with DHS/FPS requires VT-SGI, as the Contractor, to "immediately report any adverse information (e.g. that may impact **employment suitability, performance suitability, or security**) coming to their attention concerning contract employees under the contract to the COTR." (Ex. 1, Graf Depo. Exhibit 1, Statement of Work Contract, at p. 51).

131. VT-SGI never reported Wesley Bohrn to the COTR at any time. (Ex. 14, Fassett Declaration at ¶22).

**PSO Anderson**

132. Larry Anderson is a white, male PSO who worked for VT-SGI. (Ex. 23, Graf Depo. Exhibit 20).

133. On April 27, 2015, FPS received a customer complaint about PSO Anderson from a federal employee at 2306 E. Bannister Road.[2] (Ex. 4, Graf Depo. at 141:2-143:31; Ex. 24, Graf Depo. Exhibit 19 – Emails and Documents Re PSO Anderson).

134. The complaint alleged PSO Anderson "detained the complainant for 15 minutes questioning her about her disability and asked for a doctor's note explaining her disability." (Ex. 24, Graf Depo. Exhibit 19).

_____

[2] The same location that PSO Kaseem Hurley had worked.

135. In response to this disability harassment complaint, FPS did not request PSO Anderson to be removed from working under the contract pending an investigation. Instead, on April 30, 2015, Marcus Mason with FPS asked VT-SGI to "provide a response with what action(s) VT-SGI plans to take." (Ex. 24, Graf Depo. Exhibit 19).

136. FPS did not request PSO Anderson's suspension pending an investigation into his harassment of a female patron. (Ex. 24, Graf Depo. Exhibit 19).

137. VT-SGI's investigation into this complaint characterized PSO Anderson's conduct as "borderlines on harassment." (Ex. 24, Graf Depo. Exhibit 19 at KTH VT 00455).

138. Neither VT-SGI nor Marcus Mason with FPS considered or treated the PSO Anderson complaint as a harassment complaint. (Ex. 4, Graf Depo. at 143:10-21).

139. On May 11, 2015, PSO Anderson received a 3-day suspension for his conduct that was "found to be harassing to the customer." (Ex. 24, Graf Depo. Exhibit 19).

**PSO Brown**

140. Lawrence Brown is a white, male PSO who worked for VT-SGI. (Ex. 23, Graf Depo. Exhibit 20).

141. On October 31, 2014, FPS received a customer complaint from a federal employee about PSO Larry Brown. The customer requested PSO Brown no longer work at the federal facility for violation of post orders. (Ex. 4, Graf Depo. at 136:16-138:11; Ex. 25, Graf Depo. Exhibit 17 – Emails and Documents Re PSO Brown).

142. In response to this complaint, Marcus Mason from FPS requested VT-SGI review the complaint and "provide a response with what action(s) VT-SGI plans to take." (Ex. 25, Graft Depo. Exhibit 17).

143.     FPS did not request that PSO Brown be suspended pending an investigation, even though the federal complainant requested his removal.  (Ex. 25, Graft Depo. Exhibit 17).

144.     VT-SGI completed its investigation into the complaint that same day and on November 3, 2015 (3 days later) gave PSO Brown a 3-day suspension.  (Ex. 25, Graft Depo. Exhibit 17 at KTH VT 000469).

145.     On May 26, 2015, VT-SGI received a complaint from FPS regarding PSO Lawrence Brown, a white male employee.  (Ex. 26, Graf Depo. Exhibit 18 – Emails and Documents Re PSO Brown).

146.     FPS reported that a federal employee had complained that PSO Brown was suspected to be sleeping on duty and urinating inside the guard shack.  (Ex. 26, Graf Depo. Exhibit 18).

147.     In response to this complaint about PSO Brown, Marcus Mason from FPS asked VT-SGI to "provide a response with what action(s) VT-SGI plans to take."  (Ex. 4, Graf Depo. at 139:12-140:10; Ex. 26, Graf Depo. Exhibit 18 at KTH VT 000475).

148.     Marcus Mason of FPS did not ask that PSO Brown be suspended pending an investigation into the complaint.  (Ex. 26, Graf Depo. Exhibit 18).

149.     PSO Brown then resigned from his employment on June 4, 2015, after VT-SGI completed its investigation.  (Ex. 26, Graf Depo. Exhibit 18).  The VT-SGI investigation took only 8 days.

**PSO Hill**

150.     Twila Hill is a white, female PSO who worked for VT-SGI. (Ex. 23, Graf Depo. Exhibit 20).

151. On July 15, 2015, Marcus Mason from FPS forwarded a complaint to VT-SGI from several federal employees about PSO Hill's conduct. (Ex. 4, Graf Depo. at 131:4-132:25, 134:18-135:7; Ex. 27, Graf Depo. Exhibit 15 – Email Exchange Re PSO Hill; Ex. 4, Graf Depo. at 132:13-16).

152. FPS requested VT-SGI to review the complaint and "provide a response with what action(s) VT-SGI plans to take." (Ex. 27, Graf Depo. Exhibit 15).

153. Within days, VT-SGI completed its investigation and found PSO Hill "performed her duties in an outstanding fashion." (Ex. 27, Graf Depo. Exhibit 15).

154. With respect to VT-SGI's investigation into the negative report from FPS about Twila Hill, VT-SGI knew what the allegations against PSO Hill consisted of as they were in the email from FPS, and VT-SGI did not need to talk to the government employees to come to the conclusion that PSO Hill should not be disciplined. (Ex. 4, Graf Depo. at 134:18-135:7).

155. On September 3, 2015, FPS received another complaint about PSO Hill, with a request for removal from the federal Designated Official at the USCIS facility. (Ex. 4, Graf Depo. at 135:9-136:12; Ex. 28, Graf Depo. Exhibit 16 – Email Exchange Re PSO Hill).

156. Despite the federal customer's request for removal, Marcus Mason of FPS asked VT-SGI to review the complaint and "provide a response with what action(s) VT-SGI plans to take." (Ex. 28, Brent Graf Depo. Exhibit 16).

157. FPS did not ask that PSO Hill be suspended pending an investigation into the complaint. (Ex. 28, Graf Depo. Exhibit 16).

158. The September 2015 incident concerning PSO Hill resulted in an 8-hour suspension for PSO Hill. (Ex. 4, Graf Depo. at 135:22-24).

159.    With respect to PSO Anderson, PSO Brown and PSO Hill, the government told VT-SGI to decide what to do, whereas with Hurley and Fassett, the government had already made their decision.  (Ex. 4, Graf Depo. at 149:6-17).

160.    Fassett learned from his union steward Russell Beck and other officers in his building that Patricia Marvil, who is the Caucasian female President of VT-SGI, had given $800-$1,000 to a Caucasian employee when hardship had fallen on him and his whole house caught fire and burned.  (Ex. 6, Fassett Depo. at 138:7-19, 139:4-6, 144:25-146:13).

**Adverse Treatment**

161.    Fassett and Hurley were not treated fairly. (Ex. 22, Smallwood Declaration ¶13).

162.    No other employee has been suspended as long as Fassett or Hurley. (Ex. 18, Howard-Watts Depo. at 40:20-24).

163.    Company suspensions may be for up to 5 days.  (Ex. 18, Howard-Watts Depo. at 40:2-12).

164.    Fassett was reinstated to work on December 8, 2015 following FPS's investigation and finding that the accusation against him was unsubstantiated, but it took approximately one month after his reinstatement to get all of his certifications and credentials back which were required before he could actually return to work as a security guard at his post. (Ex. 14, Fassett Declaration at ¶25).

165.    VT-SGI did nothing in the eight months that Fassett was suspended to get him returned to work; Fassett dealt with it all.  (Ex. 6, Fassett Depo. at 89:14-23).

166.    Fassett believes VT-SGI had an obligation to put him at another location.  (Ex. 6, Fassett Depo. at 90:14-16).

34

167.    In the Offer of Employment letter from VT-SGI, it states for "Vacation" that upon completion of 1 year, 2 weeks of vacation is earned; upon completion of 8 years, three weeks is earned; and vacation is prorated for part-time (PT) employees based on hours worked. (See Ex. 13, Fassett Depo Exhibit 1 – Offer Letter).  This offer does not prorate vacation for fulltime employees based on hours worked the preceding year.  (Ex. 14, Fassett Declaration at ¶26). Vacation is accrued based on the amount of time you work.  (Ex. 6, Fassett Depo. at 93:6-7).

168.    Fassett lost his accrued vacation time during the eight months he was suspended, and it was not returned to him when he was reinstated.  (Ex. 6, Fassett Depo. at 94:14-19; Ex. 29, Fassett Depo. Exhibit 19 – Email Re Vacation Balance Reset).

169.    Fassett's reputation with the people in his community and neighborhood has suffered as a result of the VT-SGI's conduct.  (Ex. 6, Fassett Depo. at 120:15-17).

170.    He has sought counseling from his church ministers.  (Ex. 6, Fassett Depo. at 124:5-13).

171.    He was not able to sleep well as a result of the stress of the suspension.  (Ex. 6, Fassett Depo. at 124:25).

172.    He had to use multiple credit cards to pay bills and other items to survive the best way he could.  (Ex. 6, Fassett Depo. at 127:16-20).

173.    VT-SGI retaliated against Fassett by suspending him eight months and not compensating him for all the money he lost.  (Ex. 6, Fassett Depo. at 103:11-12).

174.    According to Howard-Watts, Fassett was suspended by the government and VT-SGI removed him from the schedule.  (Ex. 18, Howard-Watts Depo. at 100:20-22, 102:9-8).

## IV.     SUMMARY JUDGMENT STANDARD

When considering summary judgment under Fed.R.Civ.P. 56, the Court must review the facts in the light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from the facts.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  "If reasonable minds could differ as to the import of the evidence," summary judgment is inappropriate.  *Torgerson v City of Rochester*, 643 F.3d 1031, 1032 (8th Cir. 2011).

Under federal law, "the court should not weigh the evidence, make credibility determinations or attempt to determine the truth of the matter."  *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).  The "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor." *Id.* at 1377.  No credibility determinations should be made on a plaintiff's testimony about defendant's statements. *Montoya v. City of Flandreau*, 669 F.3d 867, 872 (8th Cir. 2012)("While a jury may credit [an officer's] characterization of the incident and disbelieve [the plaintiff] at trial, it is not our function to remove the credibility assessment from the jury."); *E.E.O.C. v. Liberal R-II School Dist.*, 314 F.3d 920, 924 (8th Cir. 2002).

In *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (U.S. 2014), the Supreme Court reinforced the admonition that "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment."  The Court stated: "The witnesses on both sides come to this case with their own perceptions, recollections, and even potential biases.  It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system.  By weighing the evidence . . . the court below neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party." *Id.* at 1867-68.

36

In a MHRA case, the Missouri Supreme Court has stated: "Summary judgment should seldom be used in employment discrimination cases, because such cases are inherently fact-based and often depend on inferences rather than on direct evidence." *Daugherty v. City of Maryland Heights*, 231 S.W.3d 814, 818 (Mo.banc 2007).

As discussed below, this case ultimately hinges on whether Defendant suspended Plaintiff because of discriminatory or retaliatory intent or motivation. As a result, summary judgment is an inappropriate mechanism to resolve this dispute and Defendant's motion should be denied.

V.      **ARGUMENTS AND AUTHORITIES**

      A.      **SUMMARY JUDGMENT SHOULD BE DENIED ON PLAINTIFF'S CLAIMS OF RACE AND AGE DISCRIMINATION UNDER THE MHRA**

            1.      **Burden of Proof under the MHRA**

Pursuant to the MHRA, the plaintiff is only required to "show that a protected characteristic contributed to the adverse employment decision." *Bowolak v. Communities,* 452 S.W.3d 688, 697 (Mo. App. E.D. 2015), citing *Holmes v. Kansas City Mo. Bd. of Police Comm'rs ex rel. Its Members*, 364 S.W.3d 615, 627 (Mo.App.W.D.2012). A "contributing factor" is a factor that "contributed a share in anything or has a part in producing the effect." *Id.*

In *Daugherty, supra,* the Missouri Supreme Court made clear that the MHRA offers greater protection against discrimination than federal law. Federal discrimination case law, where it is consistent with Missouri law, may be useful guidance, but the standards are not identical. *Id.* Under the MHRA, discrimination is defined as "any unfair treatment based on race, color, religion, national origin, ancestry, sex, age as it relates to employment, disability, or familial status as it relates to housing." *Holmes, supra,* at 626-627 (evidence of disparate discipline afforded to white officers for similar acts sufficient to establish liability).

37

## 2. Plaintiff's Prima Facie Case of Race or Age Discrimination

Defendant challenges only two of the elements of Plaintiff's prima facie case – whether Plaintiff was qualified and whether there is evidence which supports an inference of race or age discrimination. As detailed below, there is sufficient evidence to establish both of these elements.

### a. Plaintiff was qualified

There is no dispute that Plaintiff has been qualified to perform the work of a PSO since 2010. (SOF ¶¶38, 39). His Area Manager, Brian Hill testified he was doing satisfactory work as a PSO for Defendant. (SOF ¶47). VT-SGI Contract Manager Brent Graf testified that Fassett met all employment suitability requirements for FPS under the contract. (SOF ¶45). Plaintiff was qualified for the PSO position.

Without citing any authority, Defendant argues Plaintiff was not qualified after he was suspended by FPS based on an allegation of sexual harassment which disqualified him from working under the contract. This same argument was discussed and rejected in *Young v. American Airlines, Inc.*, 182 S.W.3d 647 (Mo. App. E.D. 2005). In *Young*, the Missouri Court of Appeals held: "The relevant analysis focuses on the employee's overall work record and general ability to perform their job duties, not whether the employee violated a company rule or policy on one occasion, such as in this case." *Id.* at 653.

Fassett was certainly qualified on April 22, 2015 when he stopped the woman entering the federal building and asked to see her identification as he was required to do. (SOF ¶¶ 48, 49, 54, 56, 58). He had never seen this woman before. (SOF ¶55). It is highly disputed that he violated any sexual harassment policy. (SOF ¶¶63, 69-71, 74, 115-116). Fassett continues to be qualified today. (SOF ¶¶44, 88). If Defendant's argument had any merit, every person who is suspended from employment for allegedly violating a policy could never meet the qualification prong for a prima facie case.

38

In this case, the evidence is undisputed that Fassett was qualified to work as a PSO. He has met his burden of establishing this element of his prima facie case.

### b. Plaintiff was treated differently supporting an inference of race or age discrimination

A plaintiff alleging a violation of the MHRA makes a *prima facie* case by providing any evidence that gives a rise to an inference of unlawful discrimination. *Ruppel v. City of Valley Park*, 318 S.W.3d 179, 185 (Mo. App. E.D. 2010).

It is well established that no direct evidence of discriminatory animus is necessary to prove employment discrimination. *United States Postal Bd. Governor v. Aikens*, 460 U.S. 711, 716-717, (1986); *Graham v. Long Island R.R.*, 230 F.3d 34, 43 (2d Cir. 2000). Evidence of unequal treatment is highly probative to show discriminatory intent. Employees are deemed "similarly situated" when they are "involved in or accused of the same or similar conduct and are disciplined in different ways." *Williams v. Trans States Airlines, Inc.*, 281 S.W.3d 854, 873 (E.D. 2009). Disparate treatment of similarly situated employees is the very essence of discrimination under the MHRA. *See, e.g.*, *Brady v. Univ. of Mo.*, 213 S.W.3d 101, 109 (Mo. App. 2006); *Korando v. Mallinckrodt*, 239 S.W.3d 647, 650 Mo. App. 2007).

The MHRA sets a low threshold for determining whether the plaintiff and other employees are similarly situated. In *Young v. American Airlines*, *supra*, there was a verbal altercation between a black employee, who was fired, and two white employees, who were retained. The employer argued that the black employee was not similarly situated to the white employees because (1) his violation of a company rule forbidding threats of violence was more serious than their violation of a different part of the company rule forbidding hate-related speech and (2) he admitted that he violated the company rule while they denied it. The Court of Appeals rejected the employer's argument, holding that the conduct of the employees was

"sufficiently similar" and "similar enough" to warrant equal treatment by the employer and, when the black employee was treated more harshly than the white employees, an inference of unlawful discrimination arose.  *Id.* at 654-655.

Well-reasoned federal case law also has taken a broad rather than a narrow view of the meaning of "similarly situated." Employees need only be similarly situated, not identically situated, for purposes of drawing a reasonable inference of discrimination from their differential treatment.  Federal courts have criticized an "unyielding, inflexible requirement that requires near on-on-one mapping between employees." *Humphries v. CDOCS West, Inc.,* 474 F.3d 387, 405 (7th Cir. 2007).  The proper inquiry, they have emphasized, focuses on "whether there are sufficient commonalities on the key variables between the Plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination." *Id.*  There is no requirement that the plaintiff show an identity of circumstances between him and his comparators.  "To find otherwise is to lose sight of the big picture, common-sense perspective." *Id.* at 406.  See also *Young v. Warner-Jenkinson Co.,* 152 F.3d 1018, 1022 (8th Cir.1998); *Lewis v. Heartland Inns of America, LLC,* 591 F.3d 1033, 1039 (8th Cir. 2010).

Defendant's reliance on a federal district court case from Minnesota is misplaced when it argues that PSO Bohrn was not similarly situated because FPS did not investigate his conduct. The exact same decision-makers were involved in evaluating PSO Bohrn's conduct as were involved in assessing Plaintiff's conduct. (SOF ¶¶118-131). And under applicable Missouri law, a disparate treatment plaintiff is only required to show that he was treated differently from similarly situated members of the unprotected class. *Cox v. Kansas City Chiefs Football Club, Inc.*, 473 S.W.3d 107, 119-120 (Mo. banc 2015). "In determining whether coworkers were

'similarly situated,' courts analyze factors including whether the same supervisor imposed the discipline, whether the coworkers were subject to the same standards, whether they engaged in conduct of similar seriousness, and similar factors." *Id.* To be similarly situated, coworkers do not have to be clones or "identical in every conceivable way." *Id.* at 123 n.14, citing *Coleman v. Donahoe,* 667 F.3d 835, 846 (7th Cir. 2012) and *Chaney v. Plainfield Healthcare Ctr.,* 612 F.3d 908, 916 (7th Cir. 2010).

Defendant construes the "similarly situated" test far too narrowly by arguing PSO Bohrn was never accused of sexual harassment by a government employee and FPS did not direct his suspension from working under the contract. (ECF No. 41 at p. 13). Plaintiff has shown, through competent non-hearsay evidence, that PSO Bohrn was accused of conduct meeting the definition of sexual harassment under the VT-SGI and FPS policies, and yet he was not suspended or removed from working under the FPS contract. (SOF ¶¶90, 99, 118-129).

Here, the following evidence and all reasonable inferences in favor of Plaintiff from the evidence shows Plaintiff was treated less favorably than similarly situated white PSOs.

1. PSO Bohrn had sexual harassment complaints made against him by federal government employees that were swept under the rug by VT-SGI. (SOF ¶¶118-129).

2. VT-SGI had an obligation to report any conduct issues to FPS, and it failed to report Bohrn. (SOF ¶¶97, 130, 131).

3. VT-SGI had an obligation to investigate the allegations promptly, yet it never completed an investigation into the allegations against Fassett. (SOF ¶¶76, 99, 104-106). But for the four white PSOs who were accused of "unprofessional conduct," it completed its investigations in a matter of days. (SOF ¶¶ 99, 106, 108, 132-160, 162-163).

41

4. Hurley and Fassett, both black PSOs, should have been cautioned like Bohrn was (SOF ¶¶101, 123), but instead were suspended for eight months. And the white PSOs were either not suspended (SOF ¶123) or received one-to-three days for disability harassment in violation of VT-SGI's policy (SOF ¶¶102, 132-139) or for other egregious conduct. (SOF ¶¶92, 132-160, 162).

5. While PSO Bohrn was eventually terminated for his sexually inappropriate conduct, he was never removed from work pending an FPS investigation. (SOF ¶¶118-131). In fact, none of the white PSOs were removed from working under the contract, despite some requests, pending an investigation. (SOF ¶¶ 129, 135, 141, 143, 155-157).

6. No other PSO have ever been suspended as long as Fassett or Hurley have. (SOF ¶¶ 139, 144, 158, 173).

Even the allegation of sexual harassment is specious. Fassett merely tapped the white female federal employee on the shoulder with the back of his hand to get her attention so that he could check her identification. (SOF ¶¶53-58, 63). Fassett had never seen this woman before (SOF ¶55), and was required to check the identification of all people entering the building. (SOF ¶¶48, 58). How this could be construed as sexual harassment under any reasonable definition is inexplicable. There was no sexual overtone, remark or comment. (SOF ¶¶63, 69, 71, 100). Even if FPS and VT-SGI believed Fassett winked at this woman, which he clearly denied, a wink does not evidence a pervasive or severe sexually hostile work environment. And VT-SGI clearly believed Fassett had harassed the woman or it would not have stated so in response to Fassett's unemployment claim. (SOF ¶113). VT-SGI's belief that Fassett had sexually harassed the woman evidences a discriminatory intent, especially when considered with Bohrn's

42

"unprofessional" conduct toward women at the federal facility where he worked. Plaintiff submits that telling women to come to "Big Daddy" and commenting about women's butts is far more sexually offensive than a wink.

The VT-SGI PSOs all had the same supervisors and all worked under the FPS contract. They were all subject to the same rules of conduct and governed by the same policies. (SOF ¶¶ 6-9).The undisputed facts showing the two black PSOs, Fassett and Hurley, were suspended for eight months pending an investigation (that would never have even started if Plaintiff had not contacted his Congressman), whereas the white PSOs were allowed to work during the course of their investigations and were suspended at the most for only three days. (SOF ¶¶ 66, 77-87, 132-160). This evidence supports the necessary inference of discrimination under the MHRA. A reasonable juror could conclude that Fassett's race was a contributing factor to his lengthy suspension.

A reasonable juror could also conclude that Fassett's age was a contributing factor in his treatment. Each of the PSOs who were investigated for conduct issues was over the age of 40. (See Ex. 30, List of Active Employees with Age). This suggests that younger PSOs were not subjected to the same scrutiny as older PSOs.

                **c.**      **VT-SGI is responsible for the government's directive.**

VT-SGI argues it did not discriminate against Plaintiff because the government forced it to suspend him. However, as the evidence shows, when a "non-decisionmaker performs an act motivated by a discriminatory bias that is intended to cause, and that does proximately cause, an adverse employment action, then the employer has cat's-paw liability." *Marez v. Saint-Gobain Containers, Inc.*, 688 F.3d 958, 964-65 (8th Cir. 2012), citing *Torgerson v. City of Rochester*, 643 F.3d 1031, 1045 (8th Cir.2011) (en banc); *Qamhiyah v. Iowa State Univ. of Sci. & Tech.*, 566 F.3d 733, 742 (8th Cir.2009).

43

In *Staub v. Proctor Hosp.,* 562 U.S. 411, 131 S.Ct. 1186, 1194 (2011)*,* an employment discrimination claim brought under USERRA, the Supreme Court explained that the proximate cause of the ultimate employment action "requires only some direct relation between the injury asserted and the injurious conduct alleged," such that "the exercise of judgment by the [subsequent] decisionmaker does not prevent the earlier agent's action (and hence the earlier agent's discriminatory animus) from being the proximate cause of the harm." *Id.* at 419. The *Staub* Court stated: "The employer is at fault because one of its agents committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment decision." *Id.* at 421.

Here, the adverse action was the intended consequence of FPS's discriminatory animus. Fassett was not a federal employee, and FPS was not a joint employer (SOF ¶¶50, 51), but FPS played a part in Fassett's suspension. (SOF ¶¶68, 174). Under *Staub* and its progeny, VT-SGI is liable for the suspension that the government requested. And under R. S. Mo. § 213.010, FPS was acting in the interest of VT-SGI when it gave its directive to suspend Fassett.

Evidence of FPS's discriminatory animus is apparent. Both Fassett and Hurley had white female accusers. (SOF ¶53). FPS directed that the black PSOs be suspended pending an investigation, whereas for every white PSO, FPS allowed them to continue to work while VT-SGI investigated. (SOF ¶¶92, 132-160, 162). With respect to the white PSOs, FPS directed VT-SGI to investigate and provide a response with what action(s) VT-SGI plans to take. (SOF ¶¶135, 142, 152, 156). Marcus Mason of FPS, even when asked by other federal government complainants to remove a white PSO, did not do so, and instead asked VT-SGI to decide. (SOF ¶¶140-143, 155-157). This shows differential treatment and evidences discriminating intent. VT-SGI is responsible not only for its own discriminatory animus, but also for that of the

44

government agents who influenced the Plaintiff's suspension. It is reasonable to infer that Fassett's race was a contributing factor in his suspension.

### d. Justification is not relevant in a MHRA case

Discrimination cases under the MHRA are not subject to the burden-shifting analysis under federal case law following *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). *Daugherty,* 231 S.W.3d at 819; *Hill v. Ford Motor Co.*, 277 S.W.3d 659 (Mo. banc 2009). For MHRA cases, Missouri courts may only be guided by federal law that is ***consistent*** with the plain language of the MHRA. *Daugherty*, at 818-19. Defendant's argument about its alleged non-discriminatory reason for suspending Fassett is not applicable to MHRA cases. *Id.*

### e. Pretext is not relevant under the MHRA

Under the MHRA, the evidentiary burden requires only a showing that race or age was a "contributing factor," and there is no burden to show pretext or disprove an employer's claimed legitimate reason for termination. *Wierman v. Casey's General Stores,* 638 F. 3d 984, 1002 (8th Cir. 2011); *Daugherty,* 231 S.W.3d at 819. Whether the employer had a legitimate reason to suspend Plaintiff is irrelevant. *Fleshner v. Pepose Vision Ins.*, 304 S.W.3d 81, 94 (Mo. banc 2010).

However, even if Plaintiff was required to show pretext, he has demonstrated that here. Federal case law recognizes that an "employee can prove pretext by showing the employer meted out more lenient treatment to similarly situated employees who were not in the protected class," *Harvey v. Anheuser-Busch, Inc.,* 38 F.3d 968, 972 (8th Cir.1994). Here, as detailed above, Plaintiff was treated less favorably than white PSOs.

Evidence of an employer's inconsistency in enforcing its policies also supports a finding of pretext. *Erickson v. Farmland Indus., Inc.,* 271 F.3d 718, 727 (8th Cir.2001). Here, VT-SGI failed to comply with policy that required it to report conduct violations of its PSOs. (SOF ¶¶97,

45

130-131).  VT-SGI could have requested reconsideration of Hurley's suspension under both the CBA and the SOW, but chose not to.  (SOF ¶¶93, 95, 96).  Even FPS failed to follow its own policies with respect to Fassett.  (SOF ¶¶91, 92).

Shifting explanations of an employer give rise to an inference of pretext. *E.E.O.C. v. Trans States Airlines, Inc.*, 462 F.3d 987, 995 (8th Cir. 2006).  Here, in response to Plaintiff's grievance, VT-SGI gave three shifting reasons in support of Plaintiff's suspension.  (SOF ¶¶112).

Even if Plaintiff was required to demonstrate pretext, which he is not, he has done so.

### B.  SUMMARY JUDGMENT SHOULD BE DENIED ON PLAINTIFF'S CLAIM OF RETALIATION UNDER THE MHRA

#### 1.  Burden of Proof under the MHRA

The MHRA only requires Plaintiff to show that his protected activity was a "contributing factor" to the adverse employment action to succeed on a retaliation claim. *See Templemire v. W & M Welding, Inc.*, 433 S.W.3d 371, 383 (Mo. banc 2014). Retaliation claims do not depend on the underlying complaint's success; it is irrelevant whether the initial report of discrimination was actionable. *McCrainey v. Kansas City Sch. Dist.*, 337 S.W.3d 746, 752-53 (Mo. App. E.D. 2011).

#### 2.  Plaintiff's Prima Facie Case of Retaliation

Defendant challenges Plaintiff's protected activity, and argues without protected activity, Fassett cannot show a causal connection to his adverse action.  As detailed below, there is sufficient evidence to establish not only protected activity, but also causation.

Under the MHRA, it is an unlawful discriminatory practice for an employer to "retaliate or discriminate in any manner against any other person because such person has opposed any practice prohibited by this chapter or because such person has filed a complaint, testified,

assisted, or participated in any manner in any investigation, proceeding or hearing conducted pursuant to this chapter." R.S. Mo. §213.070.2. Here, there is evidence that Fassett participated in an investigation into an allegation of sexual harassment (SOF ¶¶62, 63, 70-71, 74, 77-79, 81-82, 85-86, 115), that he opposed discriminatory treatment in his unemployment claim (SOF ¶¶113, 116) and that he filed a complaint under the MHRA (SOF ¶117). Fassett has met his burden of proof to show protected activity.

Fassett claims that VT-SGI retaliated against him when it (1) challenged his claim for unemployment (SOF ¶¶113); (2) when it failed to investigate or take any action to curtail his lengthy suspension (SOF ¶¶76, 79-80, 93, 96, 109, 111-112, 162-163, 165-166), and (3) when it eliminated his vacation based on his seniority in 2016 (SOF ¶¶167-168). Fassett's protected opposition and participation were a contributing factor to the adverse action. Contrary to VT-SGI's contention, Fassett does not claim the initial suspension is retaliatory – only that VT-SGI refused to take any action to appeal or contest the suspension after he opposed it.

Plaintiff has shown sufficient facts entitling him to a trial on his retaliation claim.

### a. Justification and Pretext are irrelevant under the MHRA

Defendant's stated reason for its conduct is irrelevant because, as stated above in Sections (V.)(A.)(2.)(d.) and (e.), business justification and pretext are <u>not</u> necessary to establish a prima facie case of retaliation under the MHRA.

### 3. Plaintiff's Retaliation Claim related to his vacation is within the scope of his Charge and thus is fully exhausted

Defendant has a fundamental misunderstanding of the breadth of an employment discrimination complaint. The scope of Plaintiff's lawsuit may be as broad as the administrative investigation which could reasonably be expected to grow out of his Charge of Discrimination. *See, Alhalabi v. Missouri Department of Natural Resources*, 300 S.W.3d 518 (Mo. App. 2009).

Missouri law liberally interprets the MHRA to further its remedial purposes and has emphasized many times that the MHRA differs from federal law in that it often provides "greater" protections. *See, e.g. Keeney v. Hereford Concrete Products, Inc.*, 911 S.W.2d 622, 625 (Mo. banc 1995) (Interpreting the "broader meaning" for retaliation under § 213.070); *Gilliland v. Missouri Athletic Club*, 272 S.W.3d 516, 523 (Mo. banc 2009) (urging courts to consider "the nature and importance of the subject matter" in awarding fees under the MHRA, because the act "recognizes the public purpose by litigation that vindicates the rights of those who are discriminated against."); *Daugherty,* at 819.

With respect to administrative filing requirements under § 213.075.1, *Hill v. Ford Motor Co, supra,* holds that courts should construe administrative filing requirements in light of their purpose: (1) Giving notice to the charged party, and (2) providing an avenue for voluntary compliance without resort to litigation. 277 S.W.3d at 669.  Here, Plaintiff's Charge of Discrimination fulfilled both purposes. Conciliation opportunities were available at the administrative level, even if not pursued.

 In *Alhalabi, supra,* the Court of Appeals held "[a]dministrative remedies are deemed exhausted as to all incidents of discrimination that are like or reasonably related to the allegations of the administrative Charge."  300 S.W.3d at 525.  The court found that the "[s]cope of the civil suit may be as broad as the scope of the administrative investigation which could reasonably be expected to grow out of the Charge of Discrimination." *Id.*  Plaintiff is entitled to all reasonable, favorable inferences from the facts, such that the retaliation is deemed likely or reasonably related to the allegations in the Charge and is within the scope of the administrative investigation which could reasonably be expected to grow out of the Charge.

48

Frankly, it defies common sense to require a claimant to continue to file Charges when dealing with a continuing course of discrimination or retaliation where the Defendant is on clear notice that this is a continuing action. (See Ex. 11 and 12). A far more practical, common sense approach was evident in *Hill*, *supra*, where the Court noted the importance of "the availability of complete redress of legitimate grievances without undue encumbrance by procedural requirements especially [in cases where] demanding full and technical compliance would have no relation to the purposes for requiring those procedures in the first instance." 277 S.W.3d at 670.

In this case, Fassett filed his Charge on August 3, 2015. He checked the box indicating "continuing action." He did not receive his Right to Sue until May 19, 2016. During the pendency of the charge, in March 2016, VT-SGI retaliated against him further by denying him his vacation based on his seniority. This claim is reasonably related to the allegations in the Charge and within the scope of the administrative investigation which could reasonably be expected to grow out of the Charge. Under appropriate Missouri law, Fassett's retaliation claim related to his vacation should be deemed exhausted.

## VI.   <u>CONCLUSION</u>

The Missouri Supreme Court recently reaffirmed the principle that a plaintiff is the master of the claims in his lawsuit. *Cox, supra.* at 118. Here, Fassett pled three causes of action under the MHRA, all of which survive summary judgment. Plaintiff has shown that issues of fact exist as to whether discrimination and/or retaliation was a contributing factor in the adverse employment actions. Accordingly, Plaintiff respectfully requests that Defendants' Motion for Summary Judgment be denied.

Respectfully Submitted,

BROWN & CURRY, LLC

*/s/ Sarah A. Brown*
Sarah A. Brown, MO#37513
Dan Curry, MO #58264
406 W. 34th Street, Suite 810
Kansas City, Missouri 64111
(816)756-5458
(816)666-9596 (fax)
sarah@brownandcurry.com

ATTORNEY FOR PLAINTIFF

50

**PLAINTIFF'S CERTIFICATE OF SERVICE**

I hereby certify that on the 11th day of December, 2017, the foregoing was electronically filed with the Clerk of the Court using the EM/ECF system, which sent notification of the following to the following:

Justin M. Dean, MO #48647
Jacquelyn M. Vavroch, MO #66687
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
4520 Main Street, Suite 400
Kansas City, Missouri 64111
(816) 471.1301
(816) 471.1303 (FAX)
justin.dean@ogletreedeakins.com
jackie.vavroch@ogletreedeakins.com
ATTORNEYS FOR DEFENDANT


_/s/ Sarah A. Brown_
Attorney for Plaintiff